**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 11** |
| | ) | |
| **BARBER & ROSS COMPANY,** | ) | **Case No. 07-50546** |
| | ) | |
| Debtor. | ) | |

_____

| | | |
|---|---|---|
| | ) | |
| **BARBER & ROSS COMPANY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adversary Proceeding No. 09-05083** |
| | ) | |
| **WACHOVIA BANK** | ) | |
| **NATIONAL ASSOCIATION,** | ) | |
| | ) | |
| Defendant. | ) | |

_____

<u>**MEMORANDUM DECISION**</u>

This adversary proceeding concerns a pre-bankruptcy commercial lending

relationship between Barber & Ross Company, the Debtor in Chapter 11 ("Debtor" or "Barber &

Ross"), and Wachovia Bank National Association ("Wachovia" or the "Bank"), the Debtor's

lender.  The issue presently before the Court is Wachovia's Motion to Dismiss Counts X through

XVIII of the Debtor's Amended Complaint pursuant to Bankruptcy Rule 7012(b) for failure to

state a claim upon which relief can be granted ("Motion").  Based on the conclusions of law set

forth in this decision, the Court will grant Wachovia's Motion with respect to counts twelve

(XII)  through eighteen (XVIII) of the Amended Complaint, but will deny such Motion with

respect to counts ten (X) and eleven (XI) and will treat the Debtor's request for punitive damages

in count eighteen as a prayer for punitive damages under count eleven.

BACKGROUND

On August 10, 2007, Moulding & Millwork, Inc., Lord Baltimore Trading, Inc. and Mill Direct Sales, Inc. filed an involuntary petition for relief against the Debtor under Chapter 7 of the Bankruptcy Code. Upon motion made by the Debtor October 2, 2007, the Court entered an order October 24, 2007 converting the Debtor's bankruptcy to a voluntary case under Chapter 11 of the Bankruptcy Code. On December 2, 2008 the Debtor filed its proposed Chapter 11 Plan of Liquidation, which was confirmed by an Order entered February 19, 2009. The effective date was March 31, 2009.

The Debtor filed a Complaint initiating this adversary proceeding on August 9, 2009. Wachovia thereafter responded with an Answer to counts one through nine of the first Complaint and a first motion to dismiss the remaining counts, counts ten through fourteen, for failure to state a claim upon which relief can be granted. Following the filing of the first Complaint, Answer, and first motion to dismiss, the Court entered an agreed scheduling order that allowed the Debtor the opportunity to respond to Wachovia's first motion to dismiss and allowed Wachovia to reply thereafter. The Court then heard argument after the filing of the memoranda from counsel at a hearing on November 2, 2009. Upon conclusion of argument at the November 2nd hearing, the matter was taken under advisement while at the same time the Court informed counsel that it would hold consideration of Wachovia's first motion to dismiss in abeyance until either the parties jointly requested the Court to render a decision or, alternatively, the Debtor requested an opportunity to amend its first Complaint. At a pre-trial conference held December 7, 2009, counsel for the Debtor requested the opportunity to amend. The Court then entered a scheduling order permitting the amendment to be made.

2

On January 19, 2010 the Debtor filed its Amended Complaint.  In the Amended Complaint, the Debtor sets forth eighteen separate counts.  Pursuant to a Motion for Summary Judgment filed by the Debtor on November 18, 2009, counts one and two of this adversary proceeding have already been resolved by agreed orders entered by the Court on December 17, 2009, and March 4, 2010, respectively.  Wachovia filed on February 9, 2010 the instant Motion to Dismiss counts ten through eighteen.  Counsel for the parties have filed written briefs with respect to this Motion and made their oral arguments before the Court on March 22, 2010, at which time the Court took such Motion under advisement.

## SUMMARY OF COMPLAINT'S FACTUAL ALLEGATIONS

According to the Debtor's Amended Complaint, until its "abrupt and unexpected closing," attributed directly to Wachovia, Barber & Ross manufactured and sold windows, doors, trim, and millwork.  (Amended Comp. ¶ 10.)  The company was founded in 1876 and had served a national customer base, "including some of the nation's top 10 builders," prior to bankruptcy.  *Id*.  Beginning in 1971, when David Joffe ("Joffe") acquired 100% of the stock, Barber & Ross began expanding and reached a point where it employed over 1200 employees and had four manufacturing facilities.  During the more than three decades since Joffe's acquisition, Wachovia and its predecessors allegedly served as the "exclusive banking partner and financial lending institution" for both  Joffe and Barber & Ross.  (Amended Comp. ¶ 12.)  Allegedly "a special relationship of trust and confidence" was developed as a result.  *Id*.  The Debtor contends that Wachovia officials "often conveyed to Barber & Ross that the Company was one of its trusted business partners and one of its best accounts."  *Id*.  Thus due to this "long-standing and

3

special relationship of trust and confidence," the Debtor "reasonably and in good faith relied

upon and trusted the Bank's advice, recommendations, and guidance and reasonably believed

that the Bank would not interfere with or impede" the Debtor's business interests. (Amended

Comp. ¶ 13.)

       In 2004 this relationship allegedly took on greater significance when the Debtor

purchased real estate in Winchester, Virginia to construct a manufacturing facility. Wachovia

financed the purchase and provided the Debtor with operating capital. The Debtor became

indebted to Wachovia under an April 7, 2004 Deed of Trust Note for a principal amount of ten

million dollars and a February 3, 2005 Third Amended and Restated Revolving Line of Credit

Note for a principal amount of thirteen million dollars. According to the allegations in the

Amended Complaint, Wachovia asserts that the indebtedness is secured by the real property in

Winchester, real property in Leesburg, Virginia,[1] all of the Debtor's inventory, equipment, and

personal property, and the Debtor's accounts receivable.

       The Debtor then began facing financial difficulties, which Wachovia "knew and

was kept apprised of," as a result of the "economic downturn in the residential real estate

market." (Amended Comp. ¶18.) The Debtor was considering re-financing possibilities and

Wachovia allegedly advised Barber & Ross of one such option. Allegedly Wachovia

recommended the Debtor refinance with an entity known as Congress Financial that Wachovia

was in the process of acquiring. Allegedly Wachovia and Congress Financial both "assured

[Barber & Ross] time and again during the ensuing months that refinancing . . . would be

---

[1] Pursuant to the agreed order on the Debtor's Motion for Summary Judgment with respect to count one of this action, "[t]he Leesburg Property is free and clear of any alleged liens or encumbrances created by the Deed of Trust and/or asserted by Wachovia." (Order Granting Summary Judgment as to Count 1 and Continuing Hearing on Count II at 2.)

accomplished." (Amended Comp. ¶ 19.) Wachovia allegedly "knew that refinancing . . . was

critical to the success of Barber & Ross as a going concern." (Amended Comp. ¶20.)

Accordingly, the Debtor alleges that because of the "long-standing and trusted banking

relationship . . . and the Bank's assurances that refinancing . . . through CF would succeed,

[Barber & Ross] relied upon those assurances and abandoned and did not explore other then

available options to refinance." (Amended Comp. ¶ 20.) However, after it had worked with

Congress Financial for several months, and "despite receiving Wachovia's repeated assurances

that refinancing efforts would succeed," Congress Financial "abruptly and without explanation"

informed the Debtor that it was not interested in refinancing the Debtor's indebtedness.

(Amended Comp. ¶ 21.) Allegedly, once the refinancing did not materialize, Wachovia began

charging the Debtor default interest and additional monthly fees. Around this time the Debtor

did take action to pay down some of its indebtedness by selling an affiliate in Indiana and Joffe

also made substantial personal loans of "several million dollars" to make payroll and maintain

Barber & Ross as a going concern. (Amended Comp. ¶ 24.)

      Although its financial condition was declining, several entities were allegedly

pursuing an acquisition of Barber & Ross. Allegedly in recognition of the fact that Barber &

Ross must remain a going concern for any sale, Wachovia "established a pattern of eschewing

other available remedies and opted to embark on a pattern of cooperation through the consistent

and repeated use of forbearance and modification agreements." (Amended Comp. ¶ 28.) In

March 2007 Wachovia loaned an additional two million dollars to the Debtor and in return

gained a collateral interest in the sale of real estate in Mebane, North Carolina, property which

previously had not been provided by the Debtor as collateral for its indebtedness. This loan is

referred to as the Mebane Loan by the parties.  Allegedly, however, Wachovia "immediately

applied approximately $1.1 million dollars of the $2 million dollar loan to [the Debtor's] existing

debt."  (Amended Comp. ¶ 30.)  Then when the property was sold in May 2007 "[Wachovia]

realized an additional $1.7 million."  (Amended Comp. ¶ 30.)  During this same month,

Wachovia had also proposed to the Debtor a sale of the latter's assets to an entity referred to as

Key Bridge Associates.  Allegedly the transaction would have paid the indebtedness in full and

left the Debtor with approximately $6.6 million in equity.  At this time, Wachovia was allegedly

charging the Debtor default interest at a rate three percent above the standard rate and charging

the Debtor a fee of $25,000 per month.

       The Key Bridge Associates transaction never materialized.  However, around

June 2007, Wachovia "affirmatively indicated or otherwise led . . . Joffe to believe that

[Wachovia] would continue forgoing pursuit of any remedies respecting the accrued arrearages

while [the Debtor] continued its efforts to restructure . . . and sell its assets to one of a number of

interested parties." (Amended Comp. ¶ 34.)  One such negotiation occurred during late May and

early June of 2007 with a group of investors referred to by the parties as the Hoffer Group.  The

proposal included a purchase price of seventeen million dollars and a deposit of $1.5 million due

June 15, 2007 with closing scheduled for July 31, 2007.  Wachovia was "kept apprised" of and

was "further aware that [its] prompt action in approving the transaction was necessary in order to

bring it to fruition."  (Amended Comp. ¶ 37.)  Wachovia was also provided with the letter of

intent which set forth the proposed terms.  Allegedly, however, Wachovia "wrongfully inserted

itself into the negotiations." (Amended Comp. ¶ 9.)   Allegedly Wachovia insisted upon

additional patently unreasonable terms including a non-refundable deposit, a non-exclusive right

to purchase, and that the transaction must close within thirty days rather than the sixty days Barber & Ross and the Hoffer Group agreed upon.  As a result, the proposed Hoffer transaction did not go forward.

In June 2007 another proposed transaction was being negotiated between the Debtor and representatives of AIC Ventures concerning a "sale/leaseback."  (Amended Comp. ¶ 44.)  Allegedly Joffe contacted Wachovia in order to obtain confirmation that Wachovia officials would make a prompt review of the proposed transaction and approve the terms since AIC Ventures was requiring Wachovia's approval.  Allegedly Wachovia led Joffe to believe that it would make such prompt review.  However, the Debtor contends that Wachovia either "intentionally or recklessly failed" to make such review or "any review whatsoever."  (Amended Comp. ¶ 48.)

In late June 2007, however, Wachovia began calling its loans, which the Debtor contends was in contravention of the parties' long-standing relationship of trust and confidence and in contravention of Wachovia's practice of foregoing its remedies and continuing to forbear.  On June 28 Wachovia allegedly demanded the Debtor pay "some money."  (Amended Comp. ¶ 52.)  The Debtor contacted Wachovia the same day concerning the AIC Ventures transaction and at that time allegedly Wachovia gave no indication of its intent to seize the Debtor's accounts receivable even if some payment was made.  Moreover, the Debtor contends that Wachovia's actions on June 28 were taken despite maturity on the Mebane Loan having been extended to June 30.  Nevertheless, given Wachovia's demand, Mr. Joffe again made available to Barber & Ross personal funds of approximately $175,000 so that it could meet payroll.  According to the Debtor, Wachovia was at that time working on another forbearance agreement.  However, on

June 29, 2007, Wachovia allegedly accelerated the Debtor's entire indebtedness and demanded

immediate payment in full.  At this same time Wachovia advised all the Debtor's accounts

receivable customers that it had accelerated the Debtor's indebtedness and payment was to be

made directly to Wachovia.  Deprived of operating capital, the Debtor's business operations

soon ceased thereafter.  Within two months the Debtor's bankruptcy proceeding had been

initiated.

## THE PARTIES' LEGAL CONTENTIONS

Count ten of the Amended Complaint alleges that Wachovia breached a contract

with the Debtor by:  accelerating amounts due under the Mebane Loan, attempting to collect

amounts due under the loan, contacting the Debtor's accounts receivable customers and directing

them to make payment to Wachovia directly, and confessing judgment against an affiliate of the

Debtor when Wachovia had no right to do so.  The Debtor also alleges in the Amended

Complaint that Wachovia committed "other and further breaches as will be shown at the trial of

this matter."  (Amended Comp. ¶ 145(E).)  This asserted cause of action relates to the following

factual allegations made in the Amended Complaint:

> 30. Notwithstanding that Barber & Ross was in default, in March 2007, Wachovia loaned an additional $2 million dollars in order to obtain collateral interests in the sale of the Company's property located in Mebane NC ("Mebane Loan") which had not been previously provided to Wachovia as security. However, Wachovia immediately applied approximately $1.1 million dollars of the $2 million dollar loan to Barber and Ross's existing debt which at the same time substantially improved its collateral position. When Mebane property was eventually sold in May 2007, the Bank realized an additional $1.7 million dollars. . . .

> 55. On or about June 29, 2007, and following David Joffe's

8

communication with Wachovia officials and his loan of $175,000.00, the Bank suddenly and without reasonable notice to Barber & Ross purported to accelerate the maturity of the Indebtedness and demand immediate payment in full, even though it had no contractual right to do so.

56. Wachovia had no right to accelerate the maturity of the Indebtedness and demand payment in full, at least as to the portion of which was not yet due. This unlawful acceleration breached not only Wachovia's contractual allegations, but also violated the relationship of trust and confidence it had developed with its longtime client, Barber & Ross.

57. Wachovia compounded its unlawful and illegal conduct by advising all of Barber & Ross' customers who owed the Company payments for account receivables . . . that the [Indebtedness] had been accelerated and directing that all Account Receivables should be remitted to the Bank. Upon information and belief, Wachovia misled the AR Customers as to the Bank's right to accelerate the Indebtedness as well as the date on which the purported acceleration occurred, which resulted in Barber & Ross no longer receiving any further collections on its Accounts Receivable. . . .

63. The Bank took this action with the respect to the Indebtedness and AR customers in spite of the fact that it was aware of the proposed AIC transaction, and had extended the maturity date on the Mebane loan and thus had no right or reason to declare all the Indebtedness immediately due and payable. . . .

75. In addition, Wachovia has also filed a confession of judgment against a Barber & Ross affiliate when it had no right to do so in an attempt to satisfy a portion of the Indebtedness.

In moving to dismiss the Debtor's breach of contract claim, Wachovia contends

that it was authorized to accelerate the indebtedness under the Mebane Loan pursuant to a cross-

default provision.[2]  Wachovia likewise contends it was authorized to accelerate the indebtedness

---

[2] The Mebane Loan provides: "**Default**.  If any of the following occurs, a default . . . under this Note shall exist . . . **Cross Default**.  At Bank's option, any default in payment or performance of any obligation under any other loans, contracts or agreements of Borrower." (Exhibit #1 to Motion at 2).

pursuant to the parties' Financing and Security Agreement.[3]  Based on these contractual

provisions and because the Debtor was in default of the Deed of Trust Note and the Revolving

Credit Note, Wachovia contends its conduct was authorized.  Wachovia highlights an admission

of the Debtor in the Amended Complaint that evinces the default upon which its actions were

predicated.[4]

   With respect to Wachovia's contact with the Debtor's accounts receivable

customers, Wachovia similarly contends that the parties' agreements authorized Wachovia's

conduct.  Wachovia highlights section 7.2.3 of the Financing and Security Agreement which

provided upon default that Wachovia had "all of the rights and remedies of a secured party under

the applicable Uniform Commercial Code."  (Exhibit #1, Part #2, to Motion at 44.)  Relying on

section 8.9A-607(a)(1) of Virginia's Uniform Commercial Code, Wachovia contends its contact

with and notifications to the Debtor's accounts receivable customers were consistent with its

rights under Article 9.

   With respect to Wachovia's confession of judgment against the Debtor's affiliate,

the Bank again asserts that its conduct was authorized by the parties' agreements.  It points to

page three of the guaranty of Barber & Ross Millwork Company which provides that "[i]f any of

---

[3] The Financing and Security Agreement provides that upon the occurrence of any "Event of Default" one remedy Wachovia could exercise was acceleration:  "The Lender may declare any or all of the Obligations to be immediately due and payable."  (Exhibit #1, Part #2, to Motion Wachovia Bank, National Association's Motion and Memorandum in Support of Motion to Dismiss Counts X Through XIV of Plaintiff's Complaint at 43.)  Although the appended version of the Financing and Security Agreement attached to the present Motion before the Court did not contain this section of the agreement, the full version of the Financing and Security Agreement was attached to the first motion to dismiss filed in this proceeding.

[4] "Notwithstanding that Barber & Ross was in default, in March 2007."  (Amended Comp. ¶ 30.)

the following events occur, a default . . . under this Guaranty shall exist: (a) failure of timely

payment or performance of the Guaranteed Obligations or a default under any Loan Document."

(Exhibit #4 to Motion at 3.)  Pursuant to page six's confession of judgment provision,

Wachovia's officers were authorized in the event of default to confess judgment against the

guarantor, Barber & Ross Millwork Company.  (Exhibit #4 to Motion at 3.)  Furthermore,

Wachovia highlights the fact that Barber & Ross Millwork Company never moved to set aside

the confessed judgment, which under Virginia law[5] had to be made within twenty-one days of

entry of the confessed judgment.

Finally, Wachovia contends that the Debtor failed to allege that any damages

were suffered as a result of the acceleration of the Mebane Loan.  Wachovia contends that the

Debtor has not alleged that it would have paid the Mebane Loan on the maturity date or alleged

that the acceleration prevented it from paying the Mebane Lane at maturity.  However, in the

Amended Complaint the Debtor does allege that the "breaches of Contract damaged Barber &

Ross in an amount to be shown at trial."  (Amended Comp. ¶ 146).

In counts eleven, twelve, and thirteen of the Amended Complaint, the Debtor

alleges Wachovia committed tortious interference with a business relationship or expectancy.  In

count eleven the Debtor specifically contends that Wachovia tortiously interfered with the

proposed transaction with the Hoffer Group.  The Debtor alleges that Wachovia wrongfully

inserted itself by requiring the additional terms it did, when it had no right to do so.  The Debtor

contends that Wachovia's tortious conduct prevented the transaction from successfully closing.

As a result, the Debtor alleges that Wachovia's tortious conduct caused damages "in excess of

---

[5] Va. Code § 8.01-433.

$23 million."  (Amended Comp. ¶ 154.)

In count twelve, the Debtor alleges Wachovia tortiously interfered with the proposed AIC Ventures transaction.  As set forth in the Amended Complaint, the Debtor alleges that Wachovia failed to promptly review the proposed transaction or to make a review of it altogether, which the Debtor contends was contrary to what Wachovia had represented.  The Debtor contends that the transaction would have occurred "but for Wachovia's actions." (Amended Comp. ¶ 160.)  As it had done in count eleven, the Debtor likewise contends that the tortious interference with the AIC Ventures transaction caused damages "in excess of $23 million."  (Amended Comp. ¶ 162.)

In the final tortious interference claim in count thirteen the Debtor contends Wachovia tortiously interfered with the Debtor's relationship with its accounts receivable customers by notifying them to pay it directly when the Mebane Loan was not yet due.  The Debtor further alleges that Wachovia "acted in a commercially unreasonable manner, in violation of established trade and improperly interfered with the existing contractual relationships between [the Debtor and its accounts receivable customers]."  (Amended Comp. ¶ 164.)  The Debtor alleges that this conduct resulted in a severe reduction of the amount collectible and amount actually collected, damaging the Debtor "by several hundred thousand dollars."  (Amended Comp. ¶ 165.)  The Debtor alleges that further damage was caused because Wachovia's conduct interfered with the Debtor's ability to complete existing orders.

In moving to dismiss counts eleven and twelve, Wachovia contends that the Debtor's tortious interference claims with the Hoffer Group and AIC Ventures transactions are implausible.  Wachovia contends that an inference that it would intentionally harm itself by

12

harming the Debtor is implausible.  Wachovia contends that it is nonsensical to argue that it

would take intentional action, as required for a tortious interference claim, to interfere with

transactions which, if successful, would have allegedly resulted in a complete pay-off to

Wachovia.  Wachovia further contends that if ultimately it had to approve a potential transaction,

there is no significance to any allegedly imposed terms.  Turning to the remaining tortious

interference claim, Wachovia contends it had the right to contact the accounts receivable

customers and direct them to pay it directly.  Because its actions were allowed under the

Financing and Security Agreement and Va. Code § 8.9A-607(a)(1), Wachovia contends its

conduct is not actionable as a tortious interference claim.

    In counts fourteen and fifteen of the Amended Complaint the Debtor alleges that

Wachovia committed constructive fraud.  The Debtor further contends in these counts that

because the parties "had a special relationship rising above that normally reposed in a

Lender/Borrower relationship," there was a "fiduciary duty running from Wachovia to [the

Debtor]."  (Amended Comp. ¶ 168.)  The Debtor contends that Wachovia breached this fiduciary

duty in committing constructive fraud.  In count fourteen the Debtor alleges that Wachovia

falsely represented and failed to disclose "material facts" regarding the Debtor's efforts to

refinance with Congress Financial.  (Amended Comp. ¶ 169.)  The Debtor contends that it relied

on these misrepresentations to its detriment and was therefore damaged.  Similarly in count

fifteen the Debtor alleges that Wachovia falsely represented "material facts" regarding its

cooperation and other actions necessary to bring the Hoffer Group and AIC Ventures

transactions to fruition.  (Amended Comp. ¶ 173.)  The Debtor contends that Wachovia's

misrepresentations concerning the proposed transactions and its breach of its fiduciary duties

caused damages.

In its Motion Wachovia contends that the Debtor's allegations fail to meet the required specificity for pleading fraud under Rule 9(b) of the Federal Rules of Civil Procedure (Bankruptcy Rule 7009(b)).  Wachovia contends that the Debtor fails to specifically identify a particular person who made false representations or the place and time when such false representations were made.  Wachovia contends the Debtor has made vague and conclusory statements at best.  Moreover, Wachovia highlights the fact that the Debtor has had two opportunities to plead fraud with the required specificity and argues it has not done so.

In count sixteen the Debtor alleges Wachovia breached implied duties of good faith and fair dealing.  The Debtor contends that the contracts governing the parties' relationship contain implied duties of good faith and fair dealing and Wachovia breached those duties in a number of ways.  First, the Debtor contends it reasonably expected Wachovia to continue its practice of forbearance absent reasonable notice to the contrary.  Second, the Debtor contends Wachovia's actions in imposing terms or otherwise failing to cooperate with respect to the Hoffer Group and AIC Ventures transactions were breaches of these duties.  Third, the Debtor contends it reasonably expected that any taking of control of and disposing of collateral would be in a reasonable manner.  The Debtor contends that Wachovia's sudden seizure of the accounts receivable without notice and without an opportunity to complete partially fulfilled orders was a breach of these duties.  Finally, the Debtor contends that Wachovia's actions in seizing the accounts receivable and taking no action to allow completion left over 200 employees with unpaid wages and without jobs, for which Wachovia is liable.

In its Motion, Wachovia contends that the implied duties of good faith and fair

14

dealing claims fail as a matter of law because they are not actionable as a separate tort in

Virginia.  Although the Debtor concedes this point, it does contend that such a claim can arise

when there has been a bad faith exercise of contractual rights.  The Debtor contends count

sixteen does therefore fall within the parameters of its breach of contract claim in count ten.

However, Wachovia also contends that none of the alleged breaches relate to provisions within

the parties' agreements.  Wachovia contends that it had no duty to continue to forbear and, in

fact, to imply such a duty would require the Court to rewrite the parties' contracts because they

otherwise do not have such a duty contained within.  Furthermore, Wachovia contends that the

Debtor failed to point to any specific provision within the parties' agreements which was

exercised in bad faith.

In count seventeen the Debtor contends that Wachovia acted in a commercially

unreasonable manner by failing to allow the Debtor to contact the accounts receivable customers

directly, in seizing and unreasonably taking control over the Debtor's accounts receivable, and

failing to allow the Debtor to complete orders.  Specifically the Debtor contends that Wachovia's

actions significantly reduced the amounts and value collectible of the accounts receivable and its

actions were "extreme" in that Wachovia could have allowed the Debtor to contact the customers

rather than send the letters it did.  (Amended Comp. ¶ 193.)  Moreover, the Debtor alleges that

the actions taken by Wachovia were contrary to the representations made and Wachovia's failure

to allow the Debtor to complete orders, which would have significantly increased the accounts'

value, led to an otherwise avoidable loss.

In its Motion, Wachovia contends that its actions were wholly consistent with the

Financing and Security Agreement and within the bounds of the Uniform Commercial Code.

15

Wachovia further contends that the Debtor's allegation that the seizure of the accounts without allowing the completion of partially fulfilled orders is without merit.  Wachovia argues that it would be difficult, if not impossible, to find a time when a manufacturer like the Debtor would not have partially completed orders.  The Bank further contends that even if a determination of better timing for giving notice to accounts receivable customers were possible, Va. Code § 8.9A-607(c)(1) has no application to the limited step of giving such notice, but rather to subsequent actions it might take or fail to act in attempting to collect the accounts, nor does such section have any bearing on Wachovia's purported failure to allow the Debtor to complete partially filled orders.

Finally, in count eighteen, the Debtor contends that because Wachovia's actions were willful, wanton, and/or committed in reckless disregard of the Debtor's rights, the Debtor is entitled to an award of punitive damages as well as costs and attorneys' fees.  To this count, Wachovia first notes that punitive damages are a remedy and not a cause of action.  With respect to the merits of requesting punitive damages, Wachovia contends that because punitive damages are only allowed in cases where there is a showing of actual malice or a willful or wanton recklessness and because Wachovia's conduct was authorized by law and the parties' agreements, punitive damages are not an appropriate or applicable remedy in this case.  Moreover, Wachovia contends that the Debtor's theory that Wachovia set out to intentionally destroy the Debtor is simply implausible.  Accordingly, Wachovia moves for dismissal of the punitive damages claim as well.

CONCLUSIONS OF LAW

16

The Court has jurisdiction over this proceeding by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on July 24, 1984.  Bankruptcy judges may hear and determine all core proceedings arising under title 11, including "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims."  28 U.S.C. § 157(b)(2)(O).  The parties are in agreement that this adversary proceeding is a "core" bankruptcy proceeding.

A motion to dismiss for failure to state a claim upon which relief may be granted is governed by Fed. R. Civ. Pro. 12(b)(6), as made applicable to adversary proceedings through Fed. R. Bankr. Pro. 7012(b).  The Court's consideration of Wachovia's Motion and the Debtor's Amended Complaint is informed by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 540, 127 S.Ct. 1955, 1974 (2007) and *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937 (2009), recently applied in this Circuit in *Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009) and *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009).  As the Fourth Circuit stated in *Nemet Chevrolet*, "in evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint."  591 F.3d at 255 (citing *Iqbal*, 129 S.Ct. at 1951-52 and *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008)).  However, as stated in *Iqbal*, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id. (*citing *Iqbal*, 129 S.Ct. at 1940 (quoting *Twombly*, 550 U.S. at 570)).  *Iqbal* holds that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,"

17

but clarifies that the "plausibility standard is not akin to a 'probability requirement,' but it asks

for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* at 256 (citing *Iqbal*,

129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570)).

In this case the Court is also confronted with a situation where the movant has

attached several of the purported contractual agreements of the parties to its Motion and the

Court must decide whether those exhibits may be considered for purposes of a motion to dismiss

rather than with a Rule 56 motion for summary judgment.  The District Court for this District has

held that "[w]hile extrinsic evidence is generally not to be considered at the Rule 12(b)(6) stage,

a court may consider a document attached to a motion to dismiss if 'it was integral to and

explicitly relied on in the complaint and the plaintiffs do not challenge its authenticity.'" *Brooks*

*v. Arthur*, 611 F.Supp.2d 592, 597 (W.D. Va. 2009) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d

609, 618 (4th Cir. 1999)).  The District Court for the Eastern District of Virginia has ruled

similarly, noting that "[a] court can . . . take into consideration at the 12(b)(6) stage documents

attached to a motion to dismiss, as long as they are integral to the complaint and authentic."

*Berry v. Gutierrez*, 587 F.Supp.2d 717, 723 (E.D. Va. 2008)(citing *Blankenship v. Manchin*, 471

F.3d 523, 526 (4th Cir. 2006) and *Sec'y of State for Defence v. Trimble Navigation, Ltd.*, 484

F.3d 700, 705 (4th Cir. 2007)).

*Analysis of the Debtor's Amended Complaint*

Neither party has disputed the application of Virginia law to counts ten through

eighteen of the Debtor's Amended Complaint.  Additionally, as a preliminary matter, although

Wachovia originally objected in its Motion to the Debtor's addition of the cause of action for

breach of contract and the cause of action for tortious interference with the Debtor's accounts

18

receivable customers because neither cause was initially pled in the first Complaint, counsel for

Wachovia conceded this point at the hearing on this matter.  Accordingly, the Court will grant

the Debtor's request to treat the Debtor's response to Wachovia's Motion as a formal motion to

amend the complaint and will accept the Amended Complaint as filed.  Turning to the

sufficiency of the Debtor's Amended Complaint, the Court will consider each of the actions in

counts ten through eighteen in turn.

## I.  Breach of Contract

In count ten the Debtor alleges that Wachovia committed breach of contract by

accelerating the Mebane Loan, attempting to collect upon acceleration, notifying the accounts

receivable customers directly, and confessing judgment against an affiliate of the Debtor to pay a

portion of the indebtedness, all of which Wachovia was allegedly not entitled to do.  Moreover,

count ten alleges that Wachovia engaged in "such other and further breaches" to be shown at

trial and that all these breaches caused damages to be shown at trial.  The elements of a breach of

contract claim in Virginia are:  "(1) a legally enforceable obligation of a defendant to a plaintiff;

(2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff

caused by the breach of obligation."  *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006) (quoting

*Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).  In Virginia, it has been held "that parties may

contract as they choose so long as what they agree to is not forbidden by law or against public

policy."  *Id. (*citing *Coady v. Strategic Resources, Inc.*, 515 S.E.2d 273, 275 (Va. 1999) (quoting

*Chesapeake & Potomac Telephone Co. v. Sisson & Ryan, Inc*., 362 S.E.2d 723, 729 (Va.

1987))).

The Court concludes that the Debtor has stated a cause of action for breach of

contract against Wachovia with respect to the Mebane Loan.  It rejects the Bank's contention that its written agreement to extend the maturity of the Mebane Loan had no real significance because of the cross-default provision and the Debtor's continuing default under other loan contracts.  This rejection is not a denial of the general efficacy of cross-default agreements, but simply represents a conclusion that a continuing default in one loan which existed at the time of the making of a maturity extension agreement for another loan ought not to be entertained as a basis for declaring a default upon the extended loan by virtue of a cross-default agreement. Wachovia doesn't dispute that it gave notice to the accounts receivable customers prior to the extended maturity date for the Mebane loan.  It is unreasonable to contend that a condition which already existed at the time the Mebane loan was extended is good cause by itself to justify exercising the cross-default remedy prior to the agreed new maturity date.  The Court further recognizes, however, that Wachovia may well have had the right to give notice to Barber & Ross customers to pay it directly under other loans as to which the latter was in default where no extension of maturity had been agreed to.  It seems doubtful but remains to be seen whether the confession of judgment against a Barber & Ross affiliate could constitute a breach of the Mebane Loan.  The Debtor has alleged that it suffered unspecified damages as a result of the purported breach of the Mebane Loan.  Such contention is surely one which Wachovia will wish to investigate in the discovery process, but that is a matter for a later day.  For these reasons the Court concludes that the Debtor has adequately alleged a breach of the Mebane loan and therefore will deny the Motion as to count ten.

II.  Tortious Interference with a Business Expectancy

In counts eleven, twelve, and thirteen of the Amended Complaint the Debtor

alleges Wachovia committed tortious interference with the former's business expectancies with

respect to the proposed Hoffer Group and AIC Ventures transactions and with the Debtor's

relationship with its accounts receivable customers.  To sustain a claim for tortious interference

with a business expectancy in Virginia the plaintiff must show:

> (1) the existence of a business relationship or expectancy, with a
> probability of future economic benefit to plaintiff; (2) defendant's
> knowledge of the relationship or expectancy; (3) a reasonable
> certainty that absent defendant's intentional misconduct, plaintiff
> would have continued the relationship or realized the expectancy; and
> (4) damage to the plaintiff.

*Signature Flight Support Corp. v. Landow Aviation Ltd. Partnership*, 2009 WL 90851 at *2

(E.D. Va. Jan. 13, 2009) (quoting *Smithfield Ham & Prods. Co. v. Portion Pac, Inc*., 905 F.

Supp. 346, 349 (E.D. Va. 1995)).  Additionally, under such a claim a "plaintiff must show that

the defendant's actions were improper." *Id.* (citing *Smithfield,* 905 F.Supp. at 349 (citing

*Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987) and *Hechler Chevrolet, Inc. v. Gen. Motors*

*Corp*., 337 S.E.2d 744, 748 (Va. 1985))).  Improper actions have been held to include "(1)

'means that are illegal or independently tortious,' (2) 'violence, threats or intimidation, bribery,

unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence,

misuse of inside or confidential information, or breach of a fiduciary relationship,' (3) means

that 'violate an established standard of a trade or profession,' (4) '[s]harp dealing, overreaching,

unfair competition,' or 'other competitive conduct below the behavior of fair men similarly

situated.'" *Id.* (quoting *Duggin v. Adams*, 360 S.E. 2d at 836-37).

A.  Alleged Tortious Interference with the Hoffer Group Transaction

The Debtor makes the following specific allegations regarding Wachovia's

21

interference with the prospective Hoffer Group transaction:

35. [I]n late May and early June 2007, Barber & Ross was engaged in negotiating a potential sale of its assets to a group of investors who included Jayme W. Hoffer (the "Hoffer Group"). The Hoffer Group Proposal called for a purchase price of $17 million dollars with a deposit of $1.5 million dollars due on June 15, 2007 and a closing date scheduled for July 31, 2007. Upon information and belief, Wachovia was timely kept apprised of the Hoffer Group negotiations and was further aware that the Bank's prompt action in approving the transaction was necessary in order to bring it to fruition. Upon information and belief, Wachovia was also fully aware that if it failed to approve or did not act with regard to the proposed transaction, the transaction would not take place.

36. Upon information and belief, Wachovia was provided with a Letter of Intent between the Hoffer Group and Barber & Ross that set out the terms of the proposed transaction.

37. Although it had no contractual right to, Wachovia wrongfully inserted itself into the negotiations between Barber & Ross and Hoffer Group. Wachovia did so by requiring the Hoffer Group to submit to a number of commercially unreasonable demands.

38. For example, Wachovia insisted that (a) Hoffer Group make a $1.5 million dollar non-refundable deposit, (b) during the 60-day time period of due diligence the Hoffer Group not have the exclusive right to pursue the purchase of Barber & Ross (despite the fact that the deposit was non-refundable if the transaction did not close); and (c) the acquisition close within thirty days as opposed to the sixty days offered by the Hoffer Group.

(Amended Comp. ¶¶ 35-38.)  On the basis of these allegations it appears that the Debtor has

alleged the existence of a prospective advantageous contract, that is, an "expectancy", with the

Hoffer Group which was known to Wachovia, that absent Wachovia's improper interference it

would have realized this expectancy, and that Barber & Ross incurred substantial damages as a

result.  The Court further concludes that, accepting the factual allegations as true, Wachovia used

improper means to interfere with this contract expectancy by demanding terms which on their face, without any explanation or justification appearing, were clearly unreasonable and facially seem to have been intended to scuttle the prospective transaction.  To be sure, when Wachovia's explanation for these terms is forthcoming after an opportunity for discovery has been provided to Barber & Ross, it may well be that there was good reason to demand the alleged terms, or the actual facts may not be what has been alleged, but right now we are dealing with whether a cause of action has been alleged.

Wachovia has contended that the allegations of the Amended Complaint to the effect that Wachovia's consent was required to the proposed Hoffer Group transaction mean that as a matter of law it could not have been guilty of any improper interference in it.  While as a factual matter it may well turn out that whatever the actions the Bank took with respect to this proposal were entirely appropriate, the Court concludes that simply the fact that its approval was required to a proposed transaction did not give it carte blanche authority to interject itself into the negotiations between Barber & Ross and the Hoffer Group.  If the Bank made demands of the Hoffer Group which had no reasonable relation to the Bank's protection of its economic interest as a secured creditor of its customer, but which were intended, or obviously would have been reasonably expected, to result in terminating any further discussions with the Hoffer Group, perhaps in furtherance of some ulterior purpose as yet unknown to the Debtor, it ought not be permitted to escape accountability for its actions on the basis that its consent was required and therefore it could withhold its consent for a good reason, no reason, or even a nefarious reason. At oral argument upon Wachovia's Motion the Court inquired of Debtor's counsel why Wachovia's consent was required to the Hoffer proposal.  Quite surprisingly, to the Court

anyway, he replied that the approval was sought by the Hoffer Group for reasons unknown to

him.  No further illumination has been provided by Wachovia to this mystery at this stage of the

proceeding because neither party has attached to its respective pleadings copies of either the

Hoffer proposal of which the Bank's approval was sought or the Bank's response to such

proposal.

Counsel for Wachovia has argued that it is implausible to believe that the Bank

would have taken action to interfere with a transaction which allegedly would have resulted in its

payment in full.  The answer to this argument is that we are looking in hindsight at the

consequences of what allegedly resulted from Wachovia's decisions.  At the time it may have

appeared to Wachovia's responsible loan officers for this credit that there was enough collateral

to protect the Bank under almost any reasonably foreseeable scenario.  It may have seemed to

him, her or them at the time that while torpedoing the Hoffer offer might be damaging to Barber

& Ross, it would not prevent the Bank from coming out whole.  According to the allegations

contained in the Amended Complaint, during this period of time Wachovia was charging the

Debtor interest upon its loans at a "default" rate three percent above the "standard" rate and "was

further charging a $25,000 per month fee to Barber and Ross."  (Amended Comp. ¶ 32.)  Such

additional benefits to the Bank might provide a plausible explanation for some of the actions it

took which otherwise appear very troublesome.  The Debtor has alleged that within a few days

after Wachovia gave notice to the former's customers to pay the Bank, the latter was involved in

discussions with members of Barber & Ross management to sell the company's assets to them or

some entity to be created by them.  It is by no means implausible that discovery may turn up

evidence that such discussions had been initiated at an earlier date and that Wachovia demanded

24

the terms it insisted upon because its loan officers believed that they had an alternative plan in

mind which might provide some additional benefit to the Bank, or conceivably for them

personally, beyond simply the payment in full of the Debtor's outstanding obligations.

For these reasons the Court concludes that the Debtor has alleged a cause of

action against Wachovia for wrongful interference with the Hoffer Group negotiations and that it

should have benefit of discovery to determine the internal motivations for the seemingly strange

decisions which the Bank made with respect to the Barber & Ross account.  Therefore, the

Motion to Dismiss count eleven will be denied.

B.  Alleged Tortious Interference with the AIC Ventures Transaction

The factual allegations relating to count twelve involving the prospective AIC

Ventures transaction are contained in paragraphs # 44 - 48 of the Amended Complaint:

44. [I]n June 2007, representatives of AIC Ventures were engaged in negotiations with representatives of Barber & Ross over a proposed sale/leaseback transaction independent of the Hoffer Group proposal.

45. Mr Joffe contacted Wachovia seeking confirmation that Bank officials would promptly review and approve the terms of the proposed sale/leaseback transaction with AIC Ventures which approval AIC was requiring. Wachovia led Mr. Joffe to believe that the Bank would make a prompt review of the proposed transaction.

46. On information and belief, Wachovia knew or was otherwise aware that AIC Ventures' interest in the sale/leaseback transaction was predicated on Barber & Ross remaining a "going concern" and that its approval was needed by AIC for the proposed transaction.

47. At all times relevant, Wachovia knew and was otherwise aware that any actions it took reducing Barber & Ross's ability to

25

continue manufacturing operations would severely restrict any
opportunity to sell the Company as a going concern. Wachovia was
also aware that there had been and continued to be significant interest
from various potential purchasers in the assets of Barber & Ross.

48. However, upon information and belief, Wachovia either
intentionally or recklessly failed to make a prompt review or any
review whatsoever of the proposed sale/leaseback transaction
between Barber & Ross and AIC Ventures as Bank officials had led
Mr. Joffe to believe they would do and in keeping with a long-
standing relationship of trust and confidence between Barber & Ross
and Wachovia.

Boiled down to their essentials, the Debtor contends that the Bank led it to believe that it would

promptly review and respond to the AIC Ventures proposal and that it did not do so. It does not

allege the existence of any contractual or other duty on Wachovia's part to do so. Instead the

Bank obviously decided to go another route. The Court concludes that no viable cause of action

has been alleged in count twelve because the Bank's alleged failure to review promptly and

respond to a contract proposal cannot reasonably be considered as an intentional interference by

improper means with that contract. Accordingly, it will sustain Wachovia's Motion as to such

count. Nevertheless, the Debtor will be permitted to conduct discovery as to the Bank's failure

to act with respect to the AIC Ventures proposal because it may shed light on the Bank's

decision making and state of mind as they may be relevant to other counts of the Amended

Complaint.

C. Alleged Tortious Interference with the Debtor's Accounts Receivable Customers

The Court agrees with case authority holding that a secured creditor's actions,

pursuant to provisions of its agreement with its customer and applicable provisions of the

Uniform Commercial Code, in exercising a legal right cannot be a basis for a tortious

interference claim, such as giving notice to the borrower's customers to make payment to the creditor directly as Wachovia did. *See Charles E. Brauer Co., Inc. v. NationsBank of Virginia, N.A.,* 466 S.E.2d 382 (Va. 1996); *Frank Brunckhorst Co., L.L.C. v. Coastal Atlantic, Inc.*, 542 F.Supp.2d 452 (E.D. Va. 2008). Accordingly, it will sustain Wachovia's Motion to Dismiss count thirteen of the Amended Complaint. Again, however, the Debtor will be permitted to conduct discovery on the Bank's reasons for so abruptly turning course from forbearance to aggressive collection efforts without any advance notice of its decision to do so.

## III. Constructive Fraud

Unlike the other causes of action pled by the Debtor, claims for fraud "must satisfy a more stringent pleading standard." *Parkman v. Elam*, 2009 WL 736067 at *3 (E.D. Va. Mar. 17, 2009). As Rule 9(b) provides, applicable to adversary proceedings in bankruptcy through Fed. R. Bankr. P. 7009, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this pleading requirement a plaintiff must "state 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Parkman,* 2009 WL 736067 at *3 (quoting *Harrison v. Savannah Westinghouse River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999)). Although the Fourth Circuit has declined to consider whether the application of Rule 9(b) is the same with respect to allegations of constructive fraud as compared with actual fraud,[6] the District Court in this District has applied Rule 9(b) in considering

---

[6] *See Tysons Toyota, Inc. v. Globe Life Ins. Co.*, 45 F.3d 428, 1994 WL 717598 at *4 (4th Cir. Dec. 29, 1994). *See also Levinson v. Massachusetts Mutual Life Ins. Co.*, 2006 WL 3337419 at n. 5 (E.D. Va. Nov. 9, 2006) (noting that the Fourth Circuit has not ruled on whether the heightened pleading standard of 9(b) applies to negligent misrepresentation claims).

pleadings of both actual and constructive fraud. *See e.g., Carter Machinery Co., Inc. v. Gonzalez*, 1988 WL 1281295 at *3 (W.D. Va. Mar. 27, 1998) (finding that claims of fraud and constructive fraud did not meet the requirements of Rule 9(b)); and *Rash v. Stryker Corp*., 589 F.Supp.2d 733, 737 (W.D. Va. 2008) (dismissing claims of fraudulent misrepresentation, fraudulent concealment, and constructive fraud for failure to plead with specificity under Rule 9(b)).

    To sustain a claim for constructive fraud in Virginia, the Debtor would ultimately have to show "by clear and convincing evidence that the defendant negligently or innocently made a false representation of material fact, and that the plaintiff suffered damage as a result of his reliance upon that misrepresentation." *Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 341-42 (Va. 2008) (citing *Prospect Dev. Co. v. Bershader*, 515 S.E.2d 291, 297 (Va. 1999); *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998); and *Blair Constr. v. Weatherford*, 485 S.E.2d 137, 138 (1997)). In cases involving constructive fraud, "[u]nder no circumstances . . . will a promise of future action support a claim of constructive fraud." *Id.* at 368 (citing *Richmond Metro. Auth.*, 507 S.E.2d at 348 and *Colonial Ford Truck Sales*, 325 S.E.2d at 94).

    A. Alleged Constructive Fraud Regarding Efforts to Refinance with Congress Financial

    The specific factual allegations made with respect to count fourteen are set forth in paragraphs # 19 - 22 of the Amended Complaint:

        19. In light of the difficulties, Barber & Ross began exploring alternative financing,[sic] Wachovia advised the Company that the Bank was acquiring Congress Financial ("CF"), an asset based lender. The Bank further advised and recommended that the Company refinance the Indebtedness with CF. Wachovia, and later

28

Wachovia's associated banking partner, CF, assured the Company time and again during the ensuing months that refinancing the Indebtedness through CF would be accomplished. Upon information and belief, Wachovia knew that refinancing the Indebtedness was critical to the success of Barber & Ross as a going concern.

20. Because of Barber & Ross's long-standing and trusted banking relationship with Wachovia, and the Bank's assurances that refinancing the Indebtedness through CF would succeed, the Company relied upon those assurances and abandoned and did not explore other then available options to refinance the Indebtedness.

21. After working with CF for several months, and despite receiving Wachovia's repeated assurances that refinancing efforts would succeed, CF abruptly and without explanation notified Barber & Ross that it was no longer interest in refinancing the Company's Indebtedness with Wachovia.

22. On information and belief, Wachovia's assurances to Barber & Ross that the Company's refinancing efforts through CF would succeed were either knowingly false or recklessly disregarded the true state of affairs.

It is readily apparent that no particulars of these representations are alleged, such as who made them, when and in what manner. The District Court for this District having previously held that the requirements of Fed. R. Civ. P. 9(b) are applicable to claims of constructive fraud as well as assertions of actual fraud, the Court concludes that the foregoing allegations fall far short of the particularity pleading requirements contained in that Rule. Further, it concludes that allegations about financing which would be extended in the future, but which in fact was not forthcoming, cannot be a basis for a constructive fraud claim. While perhaps theoretically a constructive fraud claim might lie if Congress Financial had falsely represented both to its own affiliate, Wachovia, and the Debtor an intent to extend financing which in truth it had no idea of actually doing so,

29

and Wachovia mistakenly represented to its customer the affiliate's bona fide intent to make the

loan, such a scenario seems implausible to say the least.  Furthermore, the Amended Complaint

makes no such allegation.  Accordingly, the Motion to Dismiss count fourteen will be granted.

      B.  Alleged Constructive Fraud Regarding Hoffer Group and AIC Ventures Transactions

      Upon the same rationale set forth immediately above with respect to count

fourteen, the Court concludes that claims of constructive fraud have not been made with the

requisite particularity in count fifteen and that, indeed, no clear allegation of any

misrepresentation of any present material fact upon which the Debtor relied to its detriment has

been asserted.  Accordingly, as to this count as well, the Bank's Motion to Dismiss will be

granted.

## IV.  Breach of the Duty of Good Faith and Fair Dealing

      In count sixteen the Debtor alleges Wachovia breached implied duties of good

faith and fair dealing.  Va. Code § 8.1A-304 provides that "[e]very contract or duty within the

Uniform Commercial Code imposes an obligation of good faith in its performance and

enforcement."  However, as Comment 1 to this section notes:

> This section does not support an independent cause of action for
> failure to perform or enforce in good faith.  Rather, this section
> means that a failure to perform or enforce, in good faith, a specific
> duty or obligation under the contract, constitutes a breach of that
> contract or makes unavailable, under the particular circumstances, a
> remedial right or power.

Va. Code § 8.1A-304 (cmt. 1).  As the Virginia courts have held, there can be no breach of this

duty when a party is "enforcing" contractual rights.  *Albright v. Burke & Herbert Bank & Trust

Co.*, 457 S.E.2d 776, 778 (Va. 1995) (citing *Mahoney v. NationsBank of Virginia*, 455 S.E.2d 5,

8 (Va. 1995)).  In considering the former statute,[7] which essentially mirrors the current version,

the Supreme Court of Virginia held that "the failure to act in good faith . . . does not amount to

an independent tort.  The breach . . . gives rise only to a cause of action for breach of contract."

*Charles E. Brauer Co., Inc. v. NationsBank of Virginia, N.A.*, 466 S.E.2d at 385.

        The Debtor has also alleged in the Amended Complaint that Wachovia owed the

Debtor a fiduciary duty as a result of the parties' long-standing relationship of trust and

confidence.  Although the Debtor specifically refers to the breach of this fiduciary duty in the

constructive fraud causes of action and does not denominate an independent cause of action

standing alone for breach of a fiduciary duty, the Court will consider this allegation here with the

cause of action asserting a breach of Wachovia's duty of good faith and fair dealing.  Under

Virginia law, "[a] fiduciary relationship exists where 'special confidence has been reposed in one

who in equity and good conscience is bound to act in good faith and with due regard of the

interest of the one reposing the confidence.'"  *Rossman v. Lazarus*, 2008 WL 4642213 at *7

(E.D. Va. Oct. 15, 2008) (quoting *Augusta Mut. Ins. Co. v. Mason*, 645 S.E.2d 290, 295 (Va.

2007)).  *See also Pierce Financial Corp. v. Sterling Cycle, Inc.*, 1992 WL 884734 at *5 (Va. Cir.

Ct. June 15, 1992) (citing *Allen Realty Corp. vs. Holbert*, 318 S.E.2d 592 (Va. 1984)).  This

fiduciary duty "can arise either from a contractual provision or through a common law duty."

*Rossman,* 2008 WL 4642213 at *7 (citing *Foreign Mission Bd. of Southern Baptist Convention

v. Wade*, 409 S.E.2d 144, 148 (Va. 1991)).  The courts in Virginia "recognize fiduciary

relationships between an attorney and client, an agent and principal, a trustee and *cestui que

trust,* parent and child, siblings, and caretaker and invalid."  *Id.* (citing *Johnson v. D & D Home*

---

[7] Va. Code § 8.1-203 (1964) (repealed 2003).

31

*Loans Corp.*, 2008 WL 850870 at *9 (E.D. Va. Jan. 23, 2008)).  However, "the banker-borrower

relationship . . . does not, by itself, establish a fiduciary relationship." *Id.* (citing *Marketic v.*

*U.S. Bank Nat. Ass'n,* 436 F.Supp.2d 842, 855 (N.D. Tex. 2006); *Paradise Hotel Corp. v. Bank*

*of Nova Scotia*, 842 F.2d 47, 53 (3d Cir. 1988); *Nat'l Westminster Bank*, *U.S.A. v. Ross*, 130 B.R.

656, 678-79 (S.D.N.Y. 1991), *aff'd*, 962 F.2d 1 (2d Cir. 1992)).  As a general rule, "a contract

between sophisticated commercial parties transacting at arm's length . . . does not create a

fiduciary relationship under Virginia state law." *Western Capital Partners, LLC v. Allegiance*

*Title & Escrow, Inc*., 520 F.Supp.2d 777, 782 (E.D. Va. 2007) (quoting *Mueller v. Thomas*, 84

Fed.Appx. 273, 275, 2003 WL 22989673 at *3 (4th Cir. Dec. 19, 2003)).  *See also Guaranty*

*Sav. and Loan Ass'n v. Ultimate Sav. Bank, F.S.B*, 737 F. Supp. 366, 370 (W.D. Va. 1990)

(citing *Northern Trust Co. v. F.D.I.C.*, 619 F.Supp. 1351, 1355 (D. Okla. 1985)).  Moreover,

"just because there is a business relationship, even if it is of a long duration and involves large

sums of money, it does not automatically create a fiduciary relationship." *Pierce Financial*

*Corp.,* 1992 WL 884734 at *5.  "Likewise, it is not a fiduciary relationship just because one

party to the transaction unilaterally decided to place his trust in the other party casting aside all

caution and relying totally on the other party." *Id*.  To show or establish a fiduciary duty "'there

must have been something in the course of dealings . . . from which it can be inferred that the

ordinary right to contract has been surrendered.'" *Petra Intern. Banking Corp. v. First American*

*Bank of Virginia*, 758 F.Supp. 1120 at n. 46 (E.D. Va. 1991) (quoting *Hancock v. Anderson*, 168

S.E. 458, 463 (Va. 1933)).  The question of "whether a fiduciary relationship exists is a question

of fact." *Fox v. Encounters Intern*., 2006 WL 952317 at *5 (4th Cir. 2006) (citing *Allen Realty*

*Corp.*, 318 S.E.2d at 595.

32

The Debtor has failed to allege any explicit duty under the contracts which

Wachovia failed to perform in accord with duties of good faith and fair dealing.  Likewise the

Court finds that the Debtor has not pointed to a specific contractual provision demonstrating a

fiduciary duty owed by Wachovia to the Debtor,[8] nor has the Debtor alleged facts, accepted as

true, that would demonstrate the existence of a fiduciary duty.  While the Court doesn't doubt

that a significant banking relationship existing for more than thirty years, as is alleged here,

would reasonably and likely result in, or be the product of, mutual feelings of trust and

confidence between borrower and lender in a commercial sense, that is a very different thing, at

least in Virginia, than such a long term business relationship creating fiduciary duties from either

party to the other.  The Court further believes that the recurring allegations in the Amended

Complaint that Barber & Ross reposed special confidence and trust in the Bank are conclusory in

nature and do not amount to allegations of specific facts upon which it might reasonably be

surmised that the Bank had assumed fiduciary duties to its borrower.

       The Debtor alleges that the Bank should have continued to forbear until all

reasonable efforts to sell most or all of its assets had been exhausted.  It alleges that when

Wachovia did take action beginning on June 28, 2007, it was in the process of preparing another

forbearance agreement.  The Court agrees with Wachovia that a secured lender's voluntary

forbearance to assert its rights, in the absence of any allegation that some specific agreement for

a restructuring of the loan or an agreed extension of its maturity date had been made, does not

somehow create some kind of new contractual duty to continue such forbearance.  While the

---

[8] *See e.g., Guaranty Sav. and Loan Ass'n v. Ultimate Sav. Bank, F.S.B.*, 737 F.Supp. 366
(W.D. Va. 1990) (noting that the language of the parties' loan participation agreement
specifically provided for the creation of a fiduciary relationship).

33

Court can understand Mr. Joffe's feeling of betrayal at Wachovia's abrupt change of course, it

must follow clear Virginia law that there is no free floating duty of good faith and fair dealing

under which the Bank's actions in deciding to exercise its contractual rights in the manner it

chose might very reasonably be challenged.   Accordingly, the Motion to Dismiss count sixteen

will be granted.

V.  Failure to Act in a Commercially Reasonable Manner

Virginia Code § 8.9A-607(c) provides that "[a] secured party shall proceed in a

commercially reasonable manner if the secured party:  (1) undertakes to collect from or enforce

an obligation of an account debtor or other person obligated on collateral."  There is no case law

of which the Court is aware with respect to this statute in Virginia.  Comment 9 dealing with this

particular section provides that a secured party's collection and enforcement rights "must be

exercised in a commercially reasonable manner" and "failure to observe the standard of

commercial reasonableness could render [the secured party] liable to an aggrieved person under

Section 9-625, and the secured party's recovery of a deficiency would be subject to Section 9-

626."  Va. Code § 8.9A-607 (cmt. 9).  Under section 9-625, "a person that, at the time of the

failure, was a debtor" may be entitled to recover damages.  Va. Code § 8.9A-625(c)(1).

In one case the Court has considered, the Southern District of New York, citing

the Fifth Circuit Court of Appeals, stated:

> Reasoning that the purpose behind the commercial reasonableness
> requirement is to protect 'the debtor from an avoidable deficiency
> judgment or the squandering of a possible surplus through the
> secured party's inaction,' the [Fifth Circuit] concluded that the
> requirement . . . comes into play when the secured party *takes
> possession and control of the accounts, preventing the debtor* from
> acting on the accounts himself, or when the secured party *undertakes*

34

> *collection so as to entitle the debtor to rely* on the former to protect
> the accounts. . . . The Fifth Circuit's well-reasoned formulation of the
> requirement obliges the secured creditor to make commercially
> reasonable collection efforts only if it takes action that removes the
> debtor's ability or wherewithal to make its own collection efforts. In
> such a case, it is only fair that the creditor be required to do what is
> commercially reasonable to collect the security because the debtor's
> hands are effectively tied. In the absence of such action by the
> creditor, the requirement to collect in a commercially reasonable
> manner simply does not arise. This rationale makes sense given the
> nature of accounts receivable, which are not tangible collateral that
> can be readily sold at auction, leased or repossessed.

*F.D.I.C. v. Wrapwell Corp.*, 2002 WL 14365, *3 (S.D. N.Y. Jan. 3, 2002) (citing *FDIC v. Fort Worth Aviation*, 806 F.2d 575 (5th Cir. 1986)).  In another case, this one cited by Wachovia in its Motion, a New York state court dismissed a defendant's contention that the plaintiff had failed to act in a commercially reasonable manner when the plaintiff secured creditor notified the defendant debtor's accounts receivable customers and instructed them to make their payments directly to the secured creditor.  *See Manufacturers and Traders Trust Co. v. Pro-Mation, Inc.*, 115 A.D.2d 976, 976 (N.Y. App. Div. 1985).  In that case the court dismissed the debtor's commercial reasonableness claim, even though many of the defendant's customers cancelled their contracts after receiving the notices, because the secured creditor's action in notifying the accounts receivable customers was authorized by both the Uniform Commercial Code and the parties' security agreement itself.

It seems clear that under the allegations of the Amended Complaint the Debtor does not challenge any action that Wachovia took or failed to take with respect to the collection of the accounts receivable other than its giving of notice to Barber & Ross customers to send their payments on account directly to the Bank.  The UCC duty upon a secured party to collect a

borrower's accounts receivable in a commercially reasonable manner[9] applies to actions which

the secured party might take or fail to take which would or might subject the borrower to a claim

from the customers or result in a loss in the value of such collateral.  The authority discussed

above makes clear that such duty does not apply to the secured party's decision to give notice to

its borrower's customers and demand that payment on the accounts be made directly to such

creditor.  The Court's research has not found any authority holding that the UCC imposes any

general duty upon contracting parties towards each other to exercise the rights they have agreed

upon in a "commercially reasonable" manner.  While as a policy matter there might be much to

be said for imposing some duty upon a secured party to calibrate its collection actions so as to

inflict only such injury to its borrower as is reasonably necessary to protect the creditor's right to

full payment, that does not appear to be the present state of the law and this Court has no

authority to create such a duty.  For these reasons the Court concludes that count seventeen fails

to allege a viable cause of action against Wachovia.  Accordingly, the latter's Motion to Dismiss

such count will be granted.

## VI.  Punitive Damages

Wachovia argues two points with respect to the Debtor's claim for punitive

damages:  (1) the cause of action should be dismissed procedurally because they are a remedy

and not a cause of action, and (2) the Debtor has wholly failed to allege facts that would support

an award of punitive damages.  Considering Wachovia's first argument, it is clear under Virginia

law that punitive damages are a remedy and not a separate cause of action.  *See e.g., Eslami v.*

*Global One Communications, Inc.*, 48 Va. Cir. 17, 1999 WL 51864 at *7 (Va. Cir. Ct. Jan. 11,

---

[9] See Va. Code § 8.9A-607(c).

1999) ("Under Virginia law, punitive damages are not a cause of action, but a remedy."); *Wyatt v. Sussex Surry, LLC*, 74 Va. Cir. 302, 2007 WL 5969399 (Va. Cir. Ct. Nov. 2, 2007) (dismissing cause of action for punitive damages where listed as a claim rather than a remedy but holding that punitive damages may still be awarded where sought in the prayer for relief).  In the Virginia circuit court cases cited, those courts dismissed separately denominated causes of action for punitive damages because punitive damages do not stand independently as a claim.  Rather, as one court held, they should be pled in a prayer for relief or *ad damnum* clause.  *See Harrell v. Woodson*, 353 S.E.2d 770, 773 (Va. 1987) ("[P]unitive damages may only be recovered where the plaintiff has made an express claim for them in the prayer for relief or *ad damnum* clause, sufficient to put the defendant on notice that an award of punitive damages is sought apart from, and in addition to, the compensatory damages claimed.").  Similarly, several federal courts have likewise opined that punitive damages are a remedy and not a cause of action under the respective state law issues they were considering.  *See e.g.*, *McMahon v. Synthron, Inc.*, 2006 WL 149054 at *5 (W.D.N.C. Jan. 18, 2006) ("As a matter of [North Carolina] law, punitive damages is not a cause of action, but is instead a remedy available in very limited circumstances."); *Ayat v. Societe v. Air France*, 2007 WL 1100315 at *2 (N.D. Cal. 2007) ("'Punitive damages are merely incident to a cause of action, and can never constitute the basis thereof.'" (citation omitted)); *Sribnyj v. City of New York*, 1990 WL 83477 at *1 (S.D.N.Y. June 13, 1990) ("[D]efendants are right that a claim for punitive damages does not state a separate cause of action under New York law." (citation omitted)); and *Murray v. Gencorp, Inc.*, 979 F.Supp. 1045, 1050 (E.D. Penn. 1997) ("[P]arties are correct that under Pennsylvania law there is no separate cause of action for punitive damages.")

However, turning to Wachovia's second argument, punitive damages are allowed under Virginia law if it is found that a defendant's conduct or actions were wanton, willful, malicious, or in conscious disregard of the rights of others.  *See e.g., Owens-Corning Fiberglas Corp. v. Watson*, 413 S.E.2d 630, 640 (Va. 1992) ("We have stated 'that negligence which is so willful or wanton as to evince a conscious disregard of the rights of others, as well as malicious conduct, will support an award of punitive damages.'"); *Eggleston v. Wal-Mart Stores East, LP*, 2005 WL 3447967 at *1 (E.D. Va. Dec. 14, 2005) ("Punitive damages are allowable only 'where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others.'"); *Ford Motor Co. v. Bartholomew*, 297 S.E.2d 675, 683-684 (Va. 1982) ("It is true . . . that a 'conscious disregard of the rights of others' is 'one of the standards of punitive damages.'").  The Supreme Court of Virginia has held, however, that "[b]ecause punitive damages are in the nature of a penalty, they should be awarded only in cases of the most egregious conduct."  *Phillip Morris, Inc. v. Emerson*, 368 S.E.2d 268, 283 (Va. 1988).  Moreover, they are not available "in suits purely *ex contractu*, and can be awarded only where an independent, wilful tort is alleged and proved."  *Gasque v. Mooers Motor Car Co., Inc.*, 313 S.E.2d 384, 388 (Va. 1984).  Finally, even where the suit alleges an independent tort, under Virginia law "an award of punitive damages must be predicated upon an award of compensatory damages."  *Murray v. Hadid*, 385 S.E.2d 898, 905 (Va. 1989) (citing *Gasque v. Mooers Motor,* 313 S.E.2d at 388.

Therefore, considering the Debtor's separately denominated cause of action for punitive damages, the Court concludes that, standing alone, a request for punitive damages does not state a cause of action.  Indeed, at oral argument upon the Motion, Mr. Yoder, counsel for the

Debtor, conceded that punitive damages are not a distinct cause of action.  Mr. Yoder also

conceded at the same hearing that punitive damages are not recoverable under the breach of

contract count.  The Amended Complaint in count eighteen specifically alleges in paragraph #

197 as follows:

> 197. Upon information and belief, the actions of Wachovia as
> set out above were willful, wanton and/or in reckless disregard of the
> rights of Barber and Ross, entitling it to an award of punitive
> damages, as well as its costs and reasonable attorneys fees, if and to
> the extent permitted by law.

Based on the foregoing, the Court will therefore grant Wachovia's Motion to Dismiss count

eighteen as a distinct cause of action but will treat the Debtor's allegations as a prayer for

punitive damages under count eleven of the Amended Complaint asserting the alleged wrongful

interference with the Hoffer Group proposal.

An Order embodying the Court's Decision will be entered contemporaneously

herewith.

DECIDED this 5th day of April, 2010.

William F. Stone, Jr.
UNITED STATES BANKRUPTCY JUDGE